# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINY PAUSINI RAMOS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:17-cv-0279 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF TRINY PAUSINI RAMOS AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Triny Pausini Ramos asserts he is entitled to benefits under Titles II and XVI the Social Security Act. Plaintiff argues the administrative law judge erred in assessing in evaluating the medical evidence. Because the ALJ failed to identify specific and legitimate reasons rejecting the opinions of Plaintiff's treating physician, the decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

On April 5, 2013, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 11-3 at 11) In the applications, Plaintiff alleged his disability began February 22, 2013. (Doc. 11-6 at 4, 11) The Social Security Administration denied the applications at the initial level on September 5, 2013, and upon reconsideration on January 2, 2014. (*See generally* Doc. 11-4) After requesting a hearing, Plaintiff testified under oath before an ALJ on

July 29, 2015. (Doc. 11-3 at 11, 32) The ALJ found Plaintiff was not disabled as defined by the Social Security Act, and issued an order denying benefits on September 14, 2015. (*Id.* at 11-21) Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on January 9, 2017. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A. Relevant Medical Evidence

On February 19, 2013, Plaintiff was taken by ambulance to the Adventist Medical Center in Reedley, California, due to difficulty breathing, chest pain, and lightheadedness. (Doc. 11-8 at 2-4, 22, 45) In addition, Plaintiff had palpitations and was "near syncope." (*Id.* at 3, 45) He had x-rays on his chest and an electrocardiogram, which indicated results that were "highly suspicious for Brugada syndrome." (*Id.* at 3, 10-12) Plaintiff was in serious but stable condition, and was transferred to Community Medical Center. (*Id.*)

After the transfer the following day, Dr. George Mittendorf noted that Plaintiff's pulse rate was 122. (Doc. 11-8 at 23) Plaintiff was diagnosed with Brugada Syndrome Type I, and the physicians determined Plaintiff needed an automatic implantable cardioverter defibrillator. (*Id.* at 25, 29) He was transferred again to Fresno Heart and Surgical Hospital for the surgical procedure. (*Id.* at 28, 40)

Dr. Thampi John inserted the implantable cardio defibrillator ("ICD") on February 21, 2013. (Doc. 11-3 at 40) Dr. John noted the procedure was "to prevent sudden death."[1] (*Id.*) Plaintiff's ICD

---

[1] As explained in the Regulations' listing for arrhythmias, "[i]mplanted cardiac defibrillators are used to prevent sudden cardiac death in individuals who have had, or are at high risk for, cardiac arrest from life-threatening ventricular arrhythmias." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 4.00(F). "Most implantable cardiac defibrillators have rhythm-correcting and pacemaker capabilities." *Id.*

3

was programmed to pace his heart at the "lower rate of 50 beats per minute." (*Id.* at 41) In addition, the ICD was programmed "for ventricular fibrillation detection [at] 200 beats per minute." (*Id.*) If Plaintiff's heart rate rises, the device was set to issue a shock of 25 joules. (*Id.*)

On May 12, 2013, Plaintiff went to the hospital after his defibrillator shocked him. (Doc. 11-9 at 3) He reported that he was outside wearing a mascot costume when the ICD "fired off several times." (*Id.* at 3, 5) With the shock, Plaintiff "fell to the ground" and was taken by ambulance to the emergency room.[2] (Doc. 11-11 at 14) Plaintiff returned to the hospital on May 28, complaining of palpations, "an irregular feeling in [his] chest," and lightheadedness. (Doc. 11-9 at 19, 22) He reported that he was "shocked 7 times with [the] defibrillator within the last two weeks." (*Id.* at 19)

Plaintiff was referred to Dr. Sukh Bhajal, a heart rhythm specialist. (*See* Doc. 11-9 at 41) On June 5, 2013, Dr. Bhajal noted that Plaintiff's "ICD has gone off several times," when Plaintiff was engaged in physical activity. (*Id.* at 40) On June 28, Dr. Bhajal noted that Plaintiff reported his ICD had not shocked in the weeks since his last appointment. (*Id.*) Dr. Bhajal opined the ICD was "functioning appropriately," and there were "not… any cardiac events." (*Id.* at 33) Dr. Bhajal indicated Plaintiff should return in six months for a reevaluation. (*Id.*)

In July 2013, Plaintiff reported that he was feeling "lightheaded and dizzy," and had been "unable to walk steadily for a [couple] of weeks." (Doc. 11-9 at 48) Dr. Phillip Chu determined Plaintiff's heart had a regular rate and rhythm, "without murmurs, rubs, or gallops." (*Id.*) Dr. Chu believed Plaintiff's dizziness was "most likely caused by orthostatic hypotension" and advised him to "not stand up suddenly." (*Id.* at 33) When Plaintiff returned later that month, he denied having chest pain or shortness of breath, and said he felt "more energy." (*Id.* at 46) Dr. Chu again found Plaintiff's heart had a regular rate and rhythm. (*Id.*)

Dr. G. Lee completed a residual functional capacity assessment on September 4, 2013. (Doc. 11-4 at 8-9) Dr. Lee noted that there was "no indication that there [was] medical or other opinion evidence" to be considered in the record. (*Id.* at 8) According to Dr. Lee, Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, sit about six hours in an eight-hour day, and stand

---

[2]The Regulations indicate a shock from an ICD is "like being kicked in the chest." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 4.00(F).

4

and/o walk about six hours in an eight-hour day. (*Id.*) Dr. Lee opined Plaintiff did not have postural, manipulative, communicative, or environmental limitations. (*Id.* at 9)

On September 27, 2013, Plaintiff told Dr. Bhajal that he had "occasional tachycardia" and was "doing reasonably well." (Doc. 11-10 at 2) Dr. Bhajal checked the functioning of the ICD and found it was functioning appropriately. (*Id.* at 3) Because an EKG showed Plaintiff had sinus tachycardia, Dr. Bhajal prescribed atenolol for Plaintiff. (*Id.*) On September 30, Plaintiff also told Dr. Chu that he was experiencing dizziness and had some "light headedness when walking," though it did not happen all the time. (*Id.* at 25) Dr. Chu found Plaintiff's heart rate and rhythm were normal, and he did not have any murmurs, rubs, or gallops. (*Id.*) Due to the dizziness, Dr. Chu advised Plaintiff to "beware of low blood pressure when stand[ing] up" and to hydrate more. (*Id.*)

On October 22, 2013, Dr. Aileen Lopez treated Plaintiff for the first time. (Doc. 11-10 at 41) Plaintiff told Dr. Lopez that he had "not felt normal since" the placement of his ICD, and "in general… felt weaker, [with] dizziness, palpitations." (*Id.*) In addition, Plaintiff admitted that he had anxiety due to his situation. (*Id.*) Plaintiff requested temporarily disability because he felt that he was "not stable to go back to school/work." (*Id.*) Dr. Lopez diagnosed Plaintiff with Brugada syndrome, chronic reflux esophagitis, hypothyroidism, vertigo, fatigue, and anxiety. (*Id.* at 42) She indicated she could complete Plaintiff's paperwork for three months of disability. (*Id.*)

In December 2013, Dr. Lopez noted Plaintiff was underweight, and his heart rate was "always on the high side," with the current pulse rate of 114. (Doc. 11-11 at 38) However, she also noted Plaintiff's heart had a "regular rate and rhythm [and] no murmurs." (*Id.*)

Dr. A. Nasrabadi reviewed completed a physical residual functional capacity assessment on January 4, 2014. (Doc. 11-4 at 29-31) Dr. Nasrabadi noted there was "no indication that there [was] medical or other opinion evidence" to be weighed in the record. (*Id.* at 29) Dr. Nasrabadi believed Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit about six hours in an eight-hour day, and stand/walk about six hours in an eight-hour day. (*Id.* at 30) Dr. Nasrabadi opined that Plaintiff had postural limitations, and he should never climb ladders, ropes, or scaffolds. (*Id.*) In addition, Dr. Nasrabadi opined Plaintiff needed to avoid concentrated exposure to hazards such as machinery and heights, but had no other environmental limitations. (*Id.* at 30-31)

On January 8, 2014, Plaintiff told Dr. Lopez that he was "still getting on/off palpitations" and a fast heart rate, which he noticed "more after eating or when he move[d]." (Doc. 11-11 at 35) Dr. Lopez determined Plaintiff's heart rate was normal, and he did not appear in acute distress. (*Id.* at 36) She directed Plaintiff to return in four weeks for a "recheck of [his] pulse." (*Id.*) At an appointment the same week with Dr. Bhajal, Plaintiff reported that he had not had any ICD shocks since his last visit. (Doc. 11-10 at 52)

The following month, Plaintiff reported that he had "dizziness and nausea" after eating, and he was not sure whether it was "due to his heart or stomach." (Doc. 11-11 at 33) Dr. Lopez noted that Plaintiff lost more weight, and while he appeared well-nourished, he also appeared thin. (*Id.*) She determined that Plaintiff's pulse rate was 70, and she did not find a murmur or irregular rhythm. (*Id.*) Dr. Lopez continued to note weight loss at appointments through May 30, 2014. (*Id.* at 27, 29)

On July 3, 2014, Dr. Lopez noted that Plaintiff had "been on disability… 1 year due to being unable to work due to the Brugada syndrome." (Doc. 11-11 at 25) She observed that Plaintiff had a "history of progressive weight loss… for the past 1 year" and his "work-up… [was] unrevealing." (*Id.*) She referred Plaintiff to a nutritionist and psychiatry, and indicated hospitalization would be considered "if acute symptoms occur in relation to []his weight loss." (*Id.* at 26)

At an appointment regarding nutrition later in July 2014, Dr. Lopez reassured Plaintiff that he could "eat anything he wants, especially protein" and that he did not have to worry about foods affecting his heart. (Doc. 11-11 at 15) She explained that Plaintiff's lab results were within normal limits and Brugada syndrome was "a congenital condition and not coronary artery disease." (*Id.*) Further, Dr. Lopez noted Plaintiff's pulse rate was 66, and his heart had a "regular rate and rhythm." (*Id.*) She opined that Plaintiff's Brugada syndrome was stable, and offered to send Plaintiff to the UCSF Cardiology for a second opinion, which Plaintiff declined. (*Id.*) Plaintiff informed Dr. Lopez he was "currently enrolled in school and studying a business course[,] hoping to get a desk or clerical job in the future, something that is not manual labor so he will not exert much effort to avoid his pacemaker firing." (*Id.*)

On October 7, 2014, Dr. Lopez noted that Plaintiff's pulse rate was 76, and his heart had "regular rate and rhythm, no murmurs." (Doc. 11-11 at 10) She observed that Plaintiff's ICD had "not

fired for a long time" and the syndrome was "all stable" at the last cardiology appointment. (*Id.* at 11) Later that month, at an appointment with the nutritionist, Plaintiff reported he "walk[ed] 30-45 minutes a day, five times a week." (*Id.* at 5)

On January 1, 2015, Dr. Lopez noted Plaintiff was "applying for permanent disability" because he was "unable to work full-time" due to his conditions of Brugada syndrome, chronic fatigue, and being underweight. (Doc. 11-11 at 67) Upon examination, Dr. Lopez found Plaintiff's pulse was 102 and his blood pressure was 106.62. (*Id.*) She found his heart had a "regular rate and rhythm, no murmurs." (*Id.*)

The same date, Dr. Lopez completed a physical residual functional capacity assessment. (Doc. 11-11 at 56-59) Dr. Lopez noted she had been treating Plaintiff since October 2013 on an "as needed basis," and his prognosis was guarded. (*Id.* at 56) Dr. Lopez opined Plaintiff had difficulty with balance while ambulating, and could not walk one block on rough or uneven ground, and could climb only one flight of stairs without a handrail. (*Id.*) In addition, she believed Plaintiff should not climb scaffolds, ropes, or more than 2-3 steps on a ladder. (*Id.* at 59) Dr. Lopez opined Plaintiff could sit for one hour at a time before needing to stand or walk, and sit four to six hours total in an eight-hour day; stand for 20-30 minutes before needing to sit or walk, and a total of about an hour in an eight-hour day; and walk for one hour at a time. (*Id.* at 57-58) Dr. Lopez determined Plaintiff needed 15-minute breaks each hour during which he sat quietly. (*Id.* at 58) She indicated Plaintiff could frequently lift and carry up to five pounds, but should never carry more than ten pounds. (*Id.*) Further, Dr. Lopez indicated Plaintiff had manipulative limitations, and could reach overhead only 25% of the day. (*Id.*) She also believed that Plaintiff needed to avoid temperature extremes. (*Id.* at 59) Dr. Lopez concluded Plaintiff was likely to be off task for 25% of the day, and miss one day per month. (*Id.*)

**B.    Administrative Hearing Testimony**

Plaintiff reported that he was attending college as a part-time student, and spent six hours per week in class. (Doc. 11-3 at 34) Plaintiff stated that he attempted to work for Fiesta Auto Insurance in May 2013, but only worked for "a one-week training period" because the job was outdoors and "too strenuous." (*Id.*)

He believed he was unable to work because he was not "able to do normal activity." (Doc. 11-

7

3 at 38) He explained he felt lightheaded, could not walk right, felt weak, and would "sometimes have to lay down." (*Id.*) Plaintiff reported that even with the ICD, he had irregular heartbeats "[f]our or five times a week," for about 15 or 20 minutes each time. (*Id.*) He also said he lost about 15 pounds after the ICD was implanted, though he did not know what caused the weight loss. (*Id.*) At the time of the hearing, Plaintiff said he was 5'7" and weighed 100 pounds. (*Id.* at 33)

Plaintiff estimated that he went for walks, usually with his mother, five days a week. (Doc. 11-3 at 43-44) He said he walked for "[n]o more than a half-hour," and he sometimes had difficulty walking for that amount of time. (*Id.* at 44) He explained that he could get lightheaded and stumble, which happened as recently as two days before the hearing. (*Id.* at 44-45) Plaintiff believed that he could stand for 20 to 25 minutes at one time. (*Id.* at 46) He stated that he was able to perform some household chores, including laundry, washing dishes, vacuuming, dusting, and sweeping. (*Id.* at 51)

Plaintiff testified that Dr. Lopez was his primary care physician, and that he began seeing her in 2013. (Doc. 11-3 at 47) As of the hearing, Plaintiff stated he saw Dr. Lopez "every six weeks." (*Id.* at 48)

**C.  The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of February 22, 2013. (Doc. 1-3 at 14) At step two, the ALJ found Plaintiff had one severe impairment: Brugada syndrome. (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 24-26) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that the claimant can only occasionally balance and can never climb ropes, ladders, or scaffolds. The claimant must also avoid all exposure to hazards, such as unprotected heights and unstable moving machinery.

(*Id.* at 25) Based upon this RFC, the ALJ concluded Plaintiff was "capable of performing past relevant work as a dining room attendant." (*Id.* at 19) Further, the ALJ made an "alternative finding[] for step five," finding "there are other jobs existing in the national economy that [Plaintiff] is also able to perform." (*Id.*) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 20)

# **DISCUSSION AND ANALYSIS**

Plaintiff contends "the ALJ failed to properly evaluate the medical evidence in assessing his [residual functional capacity]." (Doc. 19 at 8) Specifically, Plaintiff argues the ALJ "failed to articulate legally sufficient reasons for rejecting the opinions of Aileen Lopez, M.D., a treating physician." (*Id.*) On the other hand, Defendant asserts that "the ALJ properly resolved the conflicting medical-opinion evidence," including the opinion of Dr. Lopez. (Doc. 30 at 6, emphasis omitted).

## A.     The ALJ's Evaluation of the Medical Record

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Here, Plaintiff contends the ALJ erred in rejecting the opinions of Dr. Lopez, which conflicted with the opinions of Drs. Lee and Nasrabadi.

Given the conflicting opinions, the ALJ was required to set forth specific and legitimate reasons to support her rejection of Dr. Lopez's opinions. *See Lester*, 81 F.3d at 830.

The ALJ explained the weight given to the opinions of Dr. Lopez as follows:

> On January 21, 2015, Dr. Lopez opined that the claimant could sit for an hour, stand for twenty to thirty minutes, and stand for one hour at a time (Ex. 13/F/2-25). Dr. Lopez also opined that the claimant could sit for up to six hours in an eight-hour day, stand or walk for [up] to one hour in an eight-hour day, frequently lift five pounds, would not be able to climb scaffolds and ropes, would be off-task at work twenty-five percent of the time, and would be absent from work one day per month (Ex. 13F/2-5). However, the other evidence of record indicates that the claimant is not as limited as Dr. Lopez opined. For example, the claimant testified that he is able to attend school, perform household chores, and walk five times per week with his mother. Moreover, all of the claimant's recent cardiac evaluations have revealed a regular heart rate and rhythm with no heart murmurs (Ex. 12F/9, 14; 15F/2; and 16F/3). Finally, while Dr. Lopez is one of the claimant's treating physicians, the claimant testified that he sees Dr. Lopez only occasionally. Therefore, I only give partial weight to the opinion of Dr. Lopez.

(Doc. 11-3 at 18)

Further, the ALJ indicated that she gave "significant weight" to the opinion of Dr. Nasrabadi, who opined Plaintiff "could perform at the light exertional level, could never climb ropes, ladders, or scaffolds, and should avoid concentrated exposure to hazards." (Doc. 11-3 at 18)

### a. Plaintiff's level of activity

The Ninth Circuit determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

The ALJ concluded the physical limitations that Dr. Lopez identified conflicted with Plaintiff's level of activity. However, review of the limitations fails to show a conflict with the activities Plaintiff identified. For example, Plaintiff testified that he attended school part-time, for only two days a week and three hours each day. (*See* Doc. 11-3 at 34, 48) His ability to sit in a class for three hours in a day does not conflict with Dr. Lopez's opinion that Plaintiff could sit for up to six hours in a day. There is no information regarding whether Plaintiff had a break in that three hours or stood during the class, such that the Court may find a conflict with the opinions that Plaintiff could only sit for an hour at a

10

time or stand for only twenty minutes.

Further, Plaintiff's statements regarding his ability to walk does not clearly conflict with the limitation identified by Dr. Lopez, who believed Plaintiff could walk for up to one hour at a time before he needed to sit down, lie down, or stand. (*See* Doc. 11-11 at 57) In October 2014, Plaintiff told his nutritionist that he "walk[ed] 30-45 minutes a day, five times a week." (Doc. 11-11 at 5) At the hearing in July 2015, Plaintiff said he walked "for [n]o more than a half-hour," and he sometimes had difficulty walking for that amount of time. (Doc. 11-3 at 44) Because Plaintiff's walking did not exceed the amount of time identified by Dr. Lopez, this evidence does not support the ALJ's conclusion that Plaintiff's walking "indicate[d] that the claimant is not as limited as Dr. Lopez opined." (*See* Doc. 11-3 at 18)

Finally, the ALJ referred to Plaintiff's ability to perform household chores as evidence that his level of activity exceeded the limitations identified by Dr. Lopez. (*See* Doc. 11-3 at 18) As the ALJ noted in her opinion, Plaintiff "testified that he lives with his mother and performs various household chores, such as doing laundry, washing dishes, vacuuming, and dusting." (*Id.* at 14) However, the ALJ fails to explain how these limited chores conflict with limitations identified by Dr. Lopez. The Court cannot speculate as to which limitations the ALJ rejected as conflicting with Plaintiff's ability to perform chores. Moreover, a claimant's ability to perform limited household chores alone is not a specific and legitimate reason to reject a physician's opinion. *See Ghanim v. Colvin,* 763 F.3d 1154, 1162 (9th Cir. 2014) (holding an ALJ erred in rejecting physicians' opinions where the claimant's "limited daily activities"— including "some basic chores" —were "not in tension with the opinions of his treating providers); *see also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987) ("evidence that [plaintiff] could assist with some household chores was not determinative of disability").

In light of the ALJ's failure to identify evidence regarding Plaintiff's level of activity that clearly conflicts with or exceeds the limitations identified by Dr. Lopez, this factor does not support the decision to give less weight to the opinions of Dr. Lopez.

    b.  *Stability of Plaintiff's cardiac condition*

As noted above, the ALJ rejects the limitations identified by Dr. Lopez, in part, because Plaintiff's "recent cardiac evaluations have revealed a regular rate and rhythm with no heart murmurs."

(Doc. 11-3 at 18) In addition, the ALJ notes that "significant weight" was given to the opinion of Dr. Nasrabadi because "the claimant's cardiology visits revealed that his Brugada syndrome is stable with the ICD." (*Id.*)

Significantly, however, the ALJ appears to equate the *stability* of Plaintiff's condition with his *functionality*. *See e.g., Lule v. Berryhill*, 2017 U.S. Dist. LEXIS 19392, at *18 (E.D. Cal. Feb. 9, 2017) (finding the ALJ erred in rejecting the physician's opinion on the grounds that the conditions were stable, explaining that "[a]lthough Plaintiff's condition was 'stable' and not worsening, there is no indication the record that the stability of her condition rendered her able to perform work for an eight-hour day"); *Richardson v. Astrue*, 2011 U.S. Dist. LEXIS 132843 at *18-19, 172 Soc. Sec. Rep. Service 69 (C.D. Cal. Nov. 17, 2011) (finding the ALJ erred where he "improperly equate[d] stability with functionality"). Indeed, "a condition can be stable but disabling." *Petty v. Astrue*, 550 F. Supp. 2d 1089, 1099 (D. Ariz. 2008); *see also Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work."). Given the fact that Plaintiff's ICD also has a pace-making function to regulate his heartrate, Dr. Lopez's findings that Plaintiff had a regular heartrate and rhythm indicate the ICD was functioning properly.

Despite the ICD functioning properly and the stability of Plaintiff's condition, Dr. Lopez indicated Plaintiff had limitations with lifting, standing, and walking; as well as a need to avoid temperature extremes, which were rejected by the ALJ. Plaintiff's stability alone was not a specific, legitimate reason for giving less weigh to Dr. Lopez's opinion. *See Cartwright-Ladendorf v. Berryhill,* 2018 U.S. Dist. LEXIS 152230 at *23 (S.D. Cal. Sept. 6, 2018) ("reliance on medical records reporting Plaintiff's heart condition as 'stable' is not a specific and legitimate reason supported by substantial evidence to reject [a physician's] opinion"). Further, the ALJ failed to explain how these limitations were inconsistent with Plaintiff's condition, and offered only her conclusions. *See also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). Thus, the ALJ erred in evaluating the objective findings of Dr. Lopez concerning Plaintiff's stability, and this factor does not support the ALJ's decision to give less weight to the

opinion of Dr. Lopez.

          *c.*      *Treatment relationship*

The ALJ indicated that she gave less weight to the limitations identified by Dr. Lopez because Plaintiff "testified that he [saw] Dr. Lopez only occasionally." (Doc. 11-3 at 18). Significantly, the Ninth Circuit has indicated that a physician who treats a patient only once may be considered a treating source when the physician's opinion represents both personal knowledge of a patient's condition and information communicated by others on a treatment team. *See Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003). Because Dr. Lopez clearly examined Plaintiff more than once and was aware of his diagnostic history, she is considered a treating physician.

Further, the Ninth Circuit determined that though "'limited observation' of [a] claimant would be a reason to give less weight to an [examining physician's] opinion ... than to the opinion of a treating physician, it is not reason to give preference to the opinion of a doctor who has *never* examined the claimant." *Lester*, 81 F.3d at 821. However, here, the ALJ gave "limited weight" to the opinion of Dr. Lopex while giving "significant weight" to the opinion of Dr. Nasrabadi, who never examined Plaintiff (*See* Doc. 11-3 at 18) Thus, the ALJ erred in giving less weight based upon the length of the treatment relationship between Plaintiff and Dr. Lopez.

## B.    Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is

fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to identify legally sufficient reasons for rejecting the physical limitations assessed by Plaintiff's treating physician, Dr. Lopez, related to Brugada syndrome. Because the ALJ failed to resolve the conflicts in the record regarding Plaintiff's limitations, the matter should be remanded for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of the medical record related to Plaintiff's physical limitations and abilities, and the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Triny Pausini Ramos and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **September 13, 2018**        **/s/ Jennifer L. Thurston**
                                     UNITED STATES MAGISTRATE JUDGE